

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 17, 2025**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| DWAYNE PAUL BRIDGES and | § | Case No. 19-44181-ELM |
| DANA MICHELLE BRIDGES, | § | |
| | § | Chapter 7 |
| Debtors. | § | |
| | § | |
| KAPITUS SERVICING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 20-04009 |
| DWYANE PAUL BRIDGES, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

In this action, Plaintiff Kapitus Servicing, Inc., formerly Colonial Funding Network, Inc., in its capacity as the authorized servicing agent for TVT Capital, LLC ("**TVT Capital**") (in such capacity, "**Kapitus**"), has filed suit against Dwayne Paul Bridges ("**Bridges**"), the chapter 7 debtor in Case No. 19-44181 ("**Bankruptcy Case**"), to seek a determination that certain judgment debt

owed by Bridges to Kapitus[1] is nondischargeable under section 523(a)(4) of the Bankruptcy Code as a debt for embezzlement.[2] Bridges timely filed his Answer in opposition to the Complaint.[3]

Having now considered the Complaint, the Answer, the parties' Stipulated Facts,[4] the parties' other pretrial submissions,[5] the evidence introduced at trial, and the representations and arguments of counsel, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[6]

## *JURISDICTION*

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(I).

---

[1] Importantly, the judgment was obtained by Kapitus in its capacity as the authorized servicing agent for TVT Capital.

[2] *See* Docket No. 8 (the "**Complaint**"). Pursuant to the Complaint, Kapitus asserted claims under §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(4). On March 26, 2021, the Court granted, in part, Bridges' motion to dismiss, thereby dismissing certain aspects of the § 523(a)(2)(A) claim and certain aspects of the § 523(a)(4) claim. *See* Docket No. 42. At trial, Kapitus further limited the claims to be pursued to a claim under § 523(a)(4) predicated solely upon embezzlement. *See* Docket No. 99 (the "**Pretrial Order**") ¶ A, at p.2; *see also* Docket No. 96 (Kapitus' pretrial brief). In the prayer for relief of the Complaint, Kapitus also requested the recovery of attorneys' fees. However, the Judgment at issue in this case did not include an award of any attorneys' fees to Kapitus and Kapitus has not asserted a cause of action for relief that would support an award of attorneys' fees. Therefore, no further discussion will be made herein with respect to the attorneys' fees request.

[3] *See* Docket No. 45 (the "**Answer**").

[4] *See* Pretrial Order ¶ B (collectively, the "**Stipulated Facts**").

[5] *See* Docket Nos. 95, 96, and 98.

[6] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

## FACTUAL BACKGROUND

Bridges is, and was at all relevant times, the sole owner of License to Chill Heating and Air, Inc. ("**LCHA**").[7] Additionally, at all relevant times, Bridges was the one who controlled LCHA, and who communicated and made all decisions on behalf of LCHA.

### A. LCHA's Business Relationship with TVT Capital and Kapitus

LCHA's business relationship with TVT Capital and Kapitus goes back to at least 2013. TVT Capital has provided funding to LCHA on several occasions by way of effectively factoring future business receivables of LCHA. Among the agreements that LCHA entered into with TVT Capital was a revenue based factoring agreement entered into in December 2015.[8] Under the agreement, TVT Capital purchased $102,851 of future business receipts for $73,995.[9] With respect to payment of the $102,851, the parties agreed that, absent a default, TVT Capital would be paid 9.0% of LCHA's business receipts, as collected, until the $102,851 had been paid in full, and that Kapitus, as the authorized servicing agent for TVT Capital, would be entitled to debit LCHA's business account in the amount of $649 per day, which the parties estimated to be the average equivalent of 9.0% of each day's business receipts.[10]

Of note, to address the possibility of the 9.0% of actual receipts differing from the daily debit amount over time, LCHA could obtain, with Kapitus' approval, an adjustment to the daily debited amount based upon a reconciliation of prior actual receipts to the daily debits, or a

---

[7] *See* Stipulated Facts, ¶ 1.

[8] *See* Defendant's Exh. E (Kapitus_001078).

[9] *See id.*

[10] *See id.*

modification to the daily debited amount and/or the percentage applied to the daily receipts on a go-forward basis to account for a longer-term anticipated change to the daily receipts.[11]

With that in mind, on or about February 10, 2016, LCHA requested, and Kapitus approved, a modification, changing the daily debit from LCHA's account to $150 until March 4, 2016, when it reverted back to $649.[12] Then, on or about March 7, 2016, LCHA requested that Kapitus stop debiting the account altogether for a brief period of time, which Kapitus approved, resulting in the account not being debited until March 17, 2016.[13] On March 17, 2016, LCHA requested yet another modification to again limit the daily debit amount to $150. Kapitus agreed, and the reduction remained in place until April 1, 2016.[14] When, later in the year, LCHA asked for yet another modification, Kapitus denied the request, indicating that TVT Capital was only willing to consider a new factoring agreement that would include a buyout of the existing agreement.[15]

### B. LCHA Enters Into the Agreement at Issue in this Case; Bridges Executes a Guaranty in Relation Thereto

On or about June 9, 2016, LCHA applied for a new contract with TVT Capital.[16] TVT Capital approved the application. As a result, TVT Capital and Bridges, on behalf of LCHA as its owner and representative and in his individual capacity as a guarantor, executed the new Revenue Based Factoring (RBF/ACH) Agreement, dated June 9, 2016 (including the Security Agreement

---

[11] Reconciliation, which may be done on a monthly basis, would involve adjusting the dollar amount debited daily from the account to accurately reflect the agreed specified percentage of collected receivables based on LCHA's bank statements. Modification would involve adjusting the specified percentage and specific daily amount for an agreed timeframe.

[12] *See* Defendant's Exh. E (Kapitus_001078).

[13] *See* Plaintiff's Exh. 24, at p. 43:5–11; *see also* Defendant's Exh. E (Kapitus_001078).

[14] *See* Defendant's Exh. E (Kapitus_001078).

[15] *See* Plaintiff's Exh. 24, at pp. 41:22–42:4, 42:23–43:4.

[16] *See id.*, at 17:2-4.

and Guaranty attached thereto, the "**Agreement**").[17] Kapitus was designated as TVT Capital's authorized servicing agent under the Agreement with LCHA's and Bridges' approval.[18]

Pursuant to the Agreement, TVT Capital purchased $140,000 (the "**Receipts Purchased Amount**") of future receipts, accounts, contract rights, and other obligations generated in the course of LCHA's business operations (the "**Receipts**") for $100,000 (the "**Purchase Price**").[19] On or about June 10, 2016, $46,731 of the Purchase Price was applied by Kapitus to effectuate LCHA's buyout of the prior TVT Capital agreement.[20]

Under the new Agreement, LCHA agreed to sell, assign and transfer to TVT Capital in consideration for the Purchase Price "*all* of [LCHA's] [Receipts] until such time as the [Receipts Purchase Amount] ha[d] been delivered by [LCHA] to [TVT Capital]."[21] Notwithstanding the all-encompassing sale, assignment and transfer of Receipts, until the time of an Event of Default under § III of the Agreement's Terms and Conditions or a violation of any of the provisions of § 1.11 of the Agreement's Terms and Conditions (referred to herein as a "**Triggering Event**"), TVT Capital agreed that the Receipts Purchased Amount would be paid to TVT Capital through the remittance of only a Specified Percentage (as defined below) of the Receipts to TVT Capital until such time as TVT Capital had received payment in full of the Receipts Purchased Amount.[22] To orchestrate such remittance, LCHA also agreed that it would irrevocably authorize only one depositing account acceptable to TVT Capital for the collection of the Receipts (the "**Account**"), and that

---

[17] *See* Stipulated Facts, ¶ 3; *see also* Plaintiff's Exh. 5 (Agreement) (KAPITUS EX. 05-001).

[18] *See id.*

[19] *See* Stipulated Facts, ¶ 4; Agreement (KAPITUS EXH. 05-001).

[20] *See* Stipulated Facts, ¶ 5; Defendants' Exhs. D (buyout form) and E (Kapitus_001078).

[21] *See* Agreement (KAPITUS EXH. 05-001) (emphasis added).

[22] *See id*.

Kapitus, as the authorized servicing agent for TVT Capital, would have the right to collect 9.0% percent (the "**Specified Percentage**") of the batch amount of LCHA's collected Receipts via Automated Clearing House (ACH) in an agreed daily amount of $829.00 (the "**Specific Daily Amount**") through debits from the Account.[23] Upon a Triggering Event, however, the Specified Percentage of the Receipts would automatically and immediately increase to 100% and the unpaid balance of the Receipts Purchased Amount would become immediately payable to TVT Capital.[24]

Included within the Agreement was also the Guaranty that Bridges, in his individual capacity, executed in favor of TVT Capital.[25] Pursuant to the Guaranty, Bridges guaranteed LCHA's "performance of all of the … covenants made by [LCHA]" in the Agreement and further agreed that he was "guaranteeing that [he] [would] not take any action or permit [LCHA] to take any action that is a breach of the [Agreement]."[26]

C.  *Bridges Places a Stop Payment on LCHA's Account*

From June 29, 2016, to August 31, 2016, Kapitus debited the Specific Daily Amount from the Account on a daily basis.[27] Although LCHA had the option to request a reconciliation or modification under the Agreement, LCHA neither made a request nor provided Kapitus with bank statements to enable the reconciliation process.[28]

---

[23] *See* Stipulated Facts, ¶ 6; *see also* Agreement (KAPITUS EXH. 05-001 and -007).

[24] *See* Agreement (KAPITUS EXH. 05-001, -003 (§ 1.11), and -004 (§ III)).

[25] *See* Agreement (KAPITUS EXH. 05-006, bottom of the page (the "**Guaranty**")).

[26] *See id.*

[27] *See* Stipulated Facts, ¶ 7.

[28] *See* Agreement (KAPITUS EXH. 05-001) (requiring bank statements to be regularly provided to Kapitus enable a reconciliation of the Specified Percentage of the collected Receipts to the Specific Daily Amount collected, and specifying that the "[f]ailure to provide all of [the] bank statements in a timely manner or missing a month shall forfeit all rights to future reconciliations").

In late August 2016, Kapitus received a notarized power of attorney with respect to LCHA from Protection Legal Group ("**PLG**"), a third-party debt settlement company. The power of attorney was signed by Bridges. Then, on or about September 1, 2016, Bridges placed a stop payment on the Account, thereby preventing Kapitus from debiting the Account.[29] Importantly, under the Agreement, the ACH debit authorization was to be irrevocable unless agreed otherwise by Kapitus (on behalf of TVT Capital).[30] Kapitus neither received a request, nor granted any authorization for LCHA to make any change to the Account.

After learning of the stop payment, Kapitus reached out to and left messages for Bridges to determine why he had placed the stop payment on the Account.[31] At first, Kapitus' communications indicated a willingness to help LCHA address any issues it may have had with Kapitus collecting under the Agreement. But, in the face of Bridges' failure to return any of Kapitus' messages, Kapitus determined that neither LCHA nor Bridges intended to abide by the Agreement. Thus, on September 9, 2016, Kapitus sent a Notice of Default and Demand for Payment to LCHA and Bridges.[32]

Thereafter, on October 21, 2016, Kapitus sued LCHA and Bridges in the Supreme Court of the State of New York (the "**New York State Court**"), seeking to recover the amount owed under the Agreement, plus interest, attorneys' fees, expenses, and costs.[33] Subsequently, Kapitus learned that, from September to December 2016, Bridges had used the collected Receipts (including what would have been the Specific Daily Amount of the Receipts) to pay for LCHA's

---

[29] *See* Stipulated Facts, ¶ 7.

[30] *See* Agreement (KAPITUS EXH. 05-003 (§ 1.1)).

[31] *See* Plaintiff's Exh. 20 (KAPITUS EXH. 20-002 and -003).

[32] *See* Defendant's Exh. F.

[33] *See* Plaintiff's Exh. 21.

business expenses.[34] The amount of the Receipts redirected by Bridges during this time frame exceeded the amount of the unpaid Receipts Purchased Amount.[35] Notably, throughout this time frame, Kapitus had continued to reach out to Bridges but never received a response.[36]

In December 2016, PLG contacted Kapitus to explain that Bridges had retained PLG to gather hardship information to present to Kapitus along with a settlement offer.[37] This was the first communication Kapitus had received on behalf of Bridges since Kapitus had discovered the stop payment on the Account. Between December 2016 and February 2017, Kapitus and PLG discussed the possibility of a settlement with respect to the Agreement, but a settlement was never reached.

On or about March 20, 2018, the New York State Court entered a judgment (the "**Judgment**") in favor of Kapitus against both LCHA and Bridges (in Bridges' case, based upon the Guaranty) for $99,086 in damages (the unpaid balance of the Receipts Purchased Amount, referred herein to as the "**Unpaid Receipts Purchased Amount**"), plus interest on the unpaid amount of the Unpaid Receipts Purchased Amount from and after August 30, 2016, at 9.0% per annum (totaling $13,853.04 as of March 20, 2018), plus costs of $550 (collectively, the "**Judgment Debt**").[38]

---

[34] *See* Stipulated Facts, ¶ 8.

[35] *See, e.g.*, Plaintiff's Exh. 11 (LCHA bank statements for November and December 2016).

[36] *See* Defendant's Exh. H (KAPITUS_001089 – KAPITUS_001091).

[37] *See id.* (KAPITUS_001089).

[38] *See* Stipulated Facts, ¶ 9; *see also* Plaintiff's Exh. 22 (

### D. Bridges Files for Bankruptcy Protection

On October 10, 2019, Bridges filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case.[39] In filing the Bankruptcy Case, Bridges seeks to obtain a discharge of all liability that he has to Kapitus on account of the Judgment Debt. Kapitus has initiated this adversary proceeding to preclude such discharge.

### DISCUSSION

Section 523(a)(4) of the Bankruptcy Code provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor from any debt for, among other things, embezzlement.[40] For purposes of § 523(a)(4), embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[41] Thus, to prevail on a claim under § 523(a)(4), a party must show that the debtor was entrusted with property of another and that there was (1) an appropriation of funds by the debtor, (2) for the debtor's use or benefit, (3) with fraudulent intent.[42] Because the aim of the Bankruptcy Code is to give the debtor a fresh start, discharge exceptions are to be narrowly construed in favor of the debtor.[43] Kapitus has the burden of proving nondischargeability under § 523(a)(4) by a preponderance of the evidence.[44]

Kapitus argues that Bridges committed embezzlement by knowingly and intentionally diverting Receipts of Kapitus (in its capacity as TVT Capital's agent) that had been entrusted to

---

[39] *See* Stipulated Facts, ¶ 10.
[40] 11 U.S.C. § 523(a)(4).
[41] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (quotation and quotation marks omitted).
[42] *See Johnson v. Steen (In re Steen)*, 626 B.R. 469, 477 (Bankr. N.D. Tex. 2021).
[43] *Miller*, 156 F.3d at 602.
[44] *Powers v. Caremark Inc. (In re Powers)*, 261 Fed. App'x 719, 723 (5th Cir. 2008).

Document    Page 10 of 17

him in his capacity as the individual in control of LCHA's Account away from Kapitus and using them for his own benefit. More specifically, Kapitus explains that when Bridges applied the stop payment to the Account, thereby preventing Kapitus from debiting the Account, such action (a) constituted an Event of Default under § 3.1 of the Agreement's Terms and Conditions, thereby automatically and immediately increasing the Specified Percentage to 100% of all Receipts, and (b) constituted a change in LCHA's arrangement with its bank that was adverse to TVT Capital for purposes of § 1.11 of the Agreement's Terms and Conditions, thereby causing (pursuant to Protection 1 of § 1.11) the full uncollected Receipts Purchased Amount plus all fees due under the Agreement to become fully due and payable immediately. Thus, when Bridges thereafter precluded Kapitus' access to the Receipts and, instead, used the Receipts for the benefit of his wholly-owned company, it constituted the appropriation of the Receipts for Bridges' own use and benefit with fraudulent intent. Bridges disputes such contentions.

## A.    *Entrustment of Funds*

The first issue to address is whether funds of Kapitus (as the authorized servicing agent for TVT Capital) were entrusted to Bridges. The Court finds that this was the case.

Pursuant to the Agreement, *all* future Receipts of LCHA were deemed sold, assigned and transferred to TVT Capital up until the time that the full amount of the Receipts Purchased Amount had been paid. That said, prior to a Triggering Event under the Agreement, TVT Capital agreed to permit LCHA to use 91% of the collected Receipts for its own purposes, only requiring that 9% of the collected Receipts be excluded and preserved and protected until the time of Kapitus' collection of them by way of the daily withdrawal of the Specific Daily Amount from the Account. Thus, prior to the Triggering Event, at a minimum 9% of all collected Receipts were entrusted to LCHA and Bridges, as the individual in control of LCHA and the Account (and bound to LCHA's

covenants pursuant to the Guaranty), until the time of their withdrawal by Kapitus from the Account. Upon Bridges' issuance of the stop payment on the Account, however, which constituted a Triggering Event under the Agreement, 100% of all existing and future collected Receipts became immediately recoverable by Kapitus and LCHA's permitted use of such Receipts was correspondingly reduced to 0%. Consequently, from and after the Triggering Event, 100% of the Receipts (up to the outstanding unpaid balance of the Receipts Purchased Amount) were entrusted to LCHA and Bridges, to be preserved and protected until the time of Kapitus' collection of them from the Account.

### B. *Appropriation of Entrusted Funds*

Next, to establish appropriation, a plaintiff must establish that the defendant exercised control over or took possession of the entrusted property.[45] Importantly, appropriation "must be of property belonging to someone other than the debtor because embezzlement 'involve[s] debts arising from the debtor's acquisition or use of property that is not the debtor's.'"[46] Kapitus asserts that Bridges appropriated Receipts collectable from the Account by Kapitus beginning on and continuing after the time of Bridges' issuance of the stop payment on the Account. Bridges contends that he did not appropriate Kapitus' funds because the Agreement did not expressly prohibit him from using the funds to pay LCHA's business expenses. That contention, however, misconstrues Kapitus' position and misses the point.

It was Bridges' placement of the stop payment on the Account, not the subsequent use of the funds, that constituted the appropriation of Receipts. Even if there had not been a Triggering Event, Bridges could only use 91% of the collected Receipts for LCHA business purposes. He

---

[45] *See Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006).
[46] *Steen*, 626 B.R. at 477 (quoting *Davenport*, 353 B.R. at 199-200).

Page 11

never had the right to use the remaining 9%.[47] Moreover, because Bridges lacked the authority under the Agreement and Guaranty to place the stop payment on the Account without Kapitus' written permission (which was never provided), the stop payment directive constituted a Triggering Event, thereby reducing LCHA's/Bridges' right to use the Receipts to 0%. And when Bridges maintained the stop payment on the Account, thereby preventing Kapitus from accessing the Account, that resulted in Bridges' appropriation of all Receipts in the Account up to the unpaid balance of the Receipts Purchased Amount. Importantly, the evidence is undisputed that, following the stop payment, Bridges exercised exclusive control over the Account.

As a result, Kapitus successfully established that from and after September 1, 2016 (the date of the stop payment directive), Bridges appropriated Receipts in the Account collectable by Kapitus up to the amount of the outstanding unpaid balance of the Receipts Purchased Amount.

C.     *Appropriation for Debtor's Use or Benefit*

Next, in relation to the question of whether Bridges appropriated the Receipts for *his* use or benefit, Bridges argued that there was no personal use because the funds were used to pay for LCHA business expenses. In this regard, while Bridges did not testify at trial, his deposition testimony was admitted into evidence. In that testimony, Bridges stated that he placed the stop payment on the Account because the business had slowed down, money was not coming in, and he was afraid that creditors would drain the Account.[48] Kapitus, on the other hand, argues that, whether used individually or the for the purpose of Bridges' business, the used was by or for the benefit of Bridges. The Court agrees.

---

[47] *See Humphries*, 516 B.R. at 870.

[48] *See* Plaintiff's Exh. 24, at p. 38:10–24; *see also id.*, at p. 74:6–10.

Bridges is and was at all relevant times the sole owner of LCHA. Thus, any direct benefit that LCHA derived on account of Bridges' use of the Receipts to pay for LCHA business expenses resulted in an indirect benefit to Bridges on account of his 100% ownership of LCHA.[49] Thus, the Court concludes that Bridges appropriated Kapitus' Receipts for his own benefit when he took unauthorized control of the Receipts and used them to pay for his company's business expenses.[50]

### D. Fraudulent Intent

Finally, fraudulent intent in the context of embezzlement is "an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property."[51] Given that direct evidence of fraudulent intent is rarely available, courts may rely on circumstantial evidence to infer intent.[52] In considering circumstantial evidence, courts have applied the following four-part test in determining whether fraudulent intent has been established for purposes of § 523(a)(4): "1) whether the debtor alone had access to the creditor's money; 2) whether the debtor had knowledge that the creditor wanted his money returned; 3) whether the debtor had accounted to the creditor for the funds; and 4) whether an accounting had been made for the funds."[53] Each of these requirements are considered in turn.

*1. Bridges Had Sole Access to Kapitus' Receipts.* First, Kapitus successfully established that from and after September 1, 2016 (the date of the stop payment directive), Bridges had sole access to all Receipts in the Account that were collectable by Kapitus. In this regard, as

---

[49] *See Humphries*, 516 B.R. at 870.

[50] *See also Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996).

[51] *See PACCAR Financial Corp. v. Dhaliwal (In re Dhaliwal)*, 630 B.R. 24, 31 (Bankr. S.D. Tex. 2021) (quotation and quotation marks omitted); *see also Davenport*, 353 B.R. at 200; *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009).

[52] *Williams v. Laughlin (In re Laughlin)*, No. 09-35842-H4-07, 2012 WL 1014754, at *13 (Bankr. S.D. Tex. Mar. 23, 2012).

[53] *Id.*

LCHA's sole owner, Bridges was the individual who had access to the Account.[54]  Once Bridges placed the stop payment on the Account, Kapitus' access to the Account and funds in the Account was revoked, leaving Bridges with sole access to the funds in the Account.  Thus, the Court concludes that Bridges alone had access to the Receipts in the Account from and after September 1, 2016.

        2. *Bridges Had Knowledge that Kapitus Wanted the Receipts Returned.*  Next, Bridges knew that Kapitus wanted the money returned.  The Agreement, signed by Bridges on behalf of LCHA, clearly stated that Kapitus was entitled to be paid the funds.  The Agreement set up a process by which LCHA was required to pay Kapitus, including a provision stating that the specified percentage that Kapitus was entitled to collect daily would go from 9% to 100% upon a Triggering Event.[55]  The evidence established that Bridges was familiar with the payment process of factoring agreements, as he had previously entered into four similar agreements.[56]  Moreover, once Bridges placed the stop payment on the Account, Kapitus began reaching out to Bridges, leaving messages and sending emails regarding the stop payment.[57]  Kapitus then sent Bridges a demand letter, informing him that Kapitus wanted and expected to be paid its funds and had been trying to reach him.[58]  Bridges failed to pay Kapitus its funds, thus resulting in Kapitus filing a lawsuit against Bridges and LCHA for failure to pay pursuant to the Agreement.[59]  Given Kapitus'

---

[54] *See* Plaintiff's Exh. 24, at p. 37:8–15 (referring to LCHA's account as Bridges' bank account).

[55] *See id.*

[56] *See* Plaintiff's Exh. 24, at pp. 36:2–37:15, 37:20–23, 73:18–22.

[57] *See* Plaintiff's Exh. 20; *see also* Defendant's Exh. H.

[58] *See* Defendant's Exh. F.

[59] *See* Plaintiff's Exh. 21.

actions from the time that Bridges placed the stop payment on the Account, the Court concludes that Bridges had knowledge that Kapitus wanted the money returned.

3.   *Bridges Did Not Account to Kapitus for the Funds*.   Bridges failed to account to Kapitus for the funds.  Bridges failed to timely account for the funds appropriated.  In this regard, Kapitus did not successfully obtain LCHA's bank statements for the months of November and December 2016 and January 2017 until January 24, 2017, months after the stop payment had been implemented.[60]  David Wolfson, Kapitus' vice president of risk management and asset recovery, provided testimony that neither Bridges nor LCHA ever provided any of LCHA's bank statements to Kapitus.  Mr. Wolfson further testified that, once Bridges placed the stop payment on the Account, Bridges ceased all communication with Kapitus until December 2016, when PLG contacted Kapitus on behalf of Bridges.  Kapitus nevertheless attempted, through both emails and phone calls, to elicit a response from Bridges regarding the status of the Receipts, but Bridges did not return those communications.[61]  Thus, the Court concludes that, while Bridges provided some of LCHA's bank statements to Kapitus as of January 24, 2017, months after the stop payment was enacted, he never accounted to Kapitus for the Receipts that were misappropriated.

4.   *Bridges Made No Accounting for the Funds*.   Bridges also did not make an accounting for the funds.  As discussed above, while Kapitus did have some of LCHA's bank statements as of January 24, 2017, Mr. Wolfson credibly testified that neither Bridges nor LCHA ever made an accounting for the receivables to Kapitus after Bridges placed the stop payment on the Account.  Additionally, while the bank statements provided information as to the amounts that were paid to and withdrawn from the Account, the bank statements failed to provide a clear story

---

[60] *See* Defendant's Exh. H (Kapitus_001088); *see also* Plaintiff's Ex. 11, at pp. 072-091.

[61] *See* Plaintiff's Ex. 20; *see also* Defendant's Exh. H.

with respect to what the money was used for.[62] The transaction descriptions in the bank statements are either generic or handwritten, with no indication of when the description was included.[63] As a result, the Court concludes that Bridges made no accounting for the funds.

     5.     *Other Indications of Fraudulent Intent*. Apart from the four-part test addressed above, the trial record reflects other circumstances indicative of Bridges' fraudulent intent. First, Bridges claimed that he placed the stop payment on the Account because LCHA's business had slowed down.[64] However, an outright stop payment on the Account was not necessary to address a slow down. Bridges knew that he could request a modification to lower the Specific Daily Amount and/or ask that Kapitus stop debiting the Account for a period of time—as he had previously done on multiple occasions in early 2016 under LCHA's prior agreement with TVT Capital.[65] Plus, after the stop payment directive was made, instead of attempting to constructively address any perceived cashflow problems, he ceased all communication with Kapitus for over three months and knowingly used the funds in the Account to pay for LCHA's business expenses without Kapitus' permission.[66] While Kapitus would not have been required to approve of a modification or abatement, Kapitus presented uncontested evidence that, upon first learning of the stop payment, it was willing and attempted to communicate with Bridges in hopes of working out any issue he had with paying Kapitus its funds. Considering that Bridges had successfully made requests for modifications and to stop debits in the past, and that instead of pursuing such relief Bridges placed the stop payment on the Account and ceased all communication with Kapitus, the

---

[62] *See* Plaintiff's Exh. 11, at pp. 072-091; *see also* Plaintiff's Exh. 12, at pp. 038-057.
[63] *See id*.
[64] *See* Plaintiff's Exh. 24, at pp. 38:13–24, 74:6–10.
[65] *See* Defendant's Exh. E (Kapitus_001078); *see also* Plaintiff's Exh. 24, at p. 43:5–11.
[66] *See* Stipulated Facts, ¶ 8.

Court concludes that Bridges had the intent to permanently deprive Kapitus of the Receipts in the Account that were collectable by Kapitus.

Based upon all of the foregoing, the evidence successfully demonstrates that Bridges had the requisite fraudulent intent when he appropriated the Receipts in the Account that were collectable by Kapitus.

## *CONCLUSION*

Based on the evidence and considerations set forth above, the Court concludes that the Judgment Debt constitutes a debt for embezzlement. As a result, the Judgment Debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). The Court will separately enter a final judgment in conformity herewith.

# # #   END OF MEMORANDUM OPINION   # # #